[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 21-13568

_____

CANDICE SORRELLS,
Individually and as next friend Z. P.,
Z.P.,

                                                    Plaintiffs-Appellees,

*versus*

CHIEF KENNY DODD,
in his Individual capacity,
et al.,

                                                    Defendants,

JOSH SMITH,
Detective in his Individual capacity,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 4:20-cv-00188-AT

_____

Before JILL PRYOR, BRANCH, and HULL, Circuit Judges.

PER CURIAM:

In 2017, Detective Josh Smith arrested Candice Sorrells for being a party to two crimes under Georgia law committed by her boyfriend, Devecio Rowland: cruelty to animals and dogfighting. After a grand jury declined to indict Sorrells and all charges against her were dismissed, Sorrells sued Smith under 42 U.S.C. § 1983 for malicious prosecution and under Georgia law for the torts of illegal arrest, false imprisonment, and intentional infliction of emotional distress ("IIED"). Smith moved for summary judgment, arguing that (1) the federal malicious prosecution claim was barred by qualified immunity; (2) the state-law claims of illegal arrest and false imprisonment were barred by official immunity; and (3) Sorrells's IIED claim failed as a matter of law. The district court denied summary judgment.

After careful review, and with the benefit of oral argument, we (1) affirm the denial of summary judgment on the issue of qualified immunity; (2) affirm the denial of summary judgment on

the issue of official immunity; and (3) dismiss the IIED issue for lack of appellate jurisdiction.

## I.    Background

### A.    Facts[1]

Sorrells was Rowland's girlfriend and is the mother of one of his children. Rowland, to help care for his child and Sorrells's other children, sometimes stayed at her house.

On August 28, 2017, Detective Smith arrested Rowland for 107 counts of animal cruelty and 107 counts of dogfighting. He was convicted on all counts in April of 2018.

One fact relating to the investigation and arrest of Rowland is relevant to Sorrells's appeal. On August 8, 2017, during his investigation of a location tied to Rowland, Animal Control Director Jeff Crawford saw a female dog and "several puppies housed in rabbit pens." When Crawford returned later, the mother dog and her puppies were no longer there.

On August 31, 2017, Smith visited Linda's, a restaurant where Sorrells worked, to interview her about Rowland's crimes. During this interview, Sorrells admitted to having the mother dog and her seven puppies, and she told Smith that Rowland had given her daughter the mother dog for her birthday in June and that the dog had given birth to the puppies at her house in early August.

---

[1] Because we evaluate this appeal at the summary judgment stage, we view the facts in the light most favorable to Sorrells as the nonmovant. *See Williams v. Aguirre*, 965 F.3d 1147, 1156 (11th Cir. 2020).

Sorrells also told Smith that he could come by her house after work to take the animals.

When Smith and another detective visited her home later that evening, Sorrells gave consent for them to enter and search. While searching the basement, Smith found a puppy in a shoebox. Unbeknownst to Sorrells, her daughter had hidden the puppy there "to keep the Officers from taking it." The rest of the dogs "were in a large wire cage" that "was clean" with "plenty [of] room to move around." Smith called an employee from the Animal Control Department to retrieve the dogs, and neither Smith nor the employee told Sorrells that they believed "that the dogs were being abused." Rather, Smith told Sorrells the dogs "looked fine."

Smith later testified in a deposition that he found nothing at Sorrells's house during that visit that "led [him] to believe that [Sorrells] was complicit with Mr. Rowland[.]" But Smith said that he thought the dogs in Sorrells's home were being abused because he did not believe the dogs had proper bedding, and because the puppy in the basement had been isolated from its mother for approximately ten to twenty minutes.[2] Smith also testified that he questioned Sorrells's ability to care for the dogs because they were "laying in feces and urine."[3] And Smith testified that he "was

---

[2] Smith explained in his deposition that the puppy was too young to eat solid foods and therefore would not "receiv[e] proper feeding" when separated from its mother.

[3] Smith, in the same deposition, contradicted himself by also testifying that he did not find feces and urine in the dog crates. When evidence "conflicts at summary judgment," we have "an obligation to view all evidence and make

21-13568                Opinion of the Court                5

provided pictures of the female [mother] dog upon her arrival at [A]nimal [C]ontrol." In Smith's opinion, the pictures showed that the mother dog "was severely underweight."

While Rowland was in jail, Smith monitored his calls, including his calls with Sorrells. From an August 30 call between Rowland and Sorrells, Smith gathered two pieces of information that he presented in his affidavit and application for a search warrant for Sorrells's home. First, according to Smith's affidavit and application for the search warrant, Rowland told Sorrells to go to "Haney Farm Supply, Cedartown Feed and Seed, and to Ace Hardware to speak with the guys or men about [Rowland] coming in every day to get supplies," revealing that Sorrells was familiar with a dog food and supply shop.[4] Second, Sorrells said she had Rowland's cell phone, which, according to Smith, "contradict[ed] what Sorrells told [officers] previously." Based solely on Sorrells's knowledge of Rowland's work contacts and her possession of the cell phone, Smith was granted a search warrant for Sorrells's home.

Officers searched Sorrells's house on September 5, 2017, finding the following items: "three black books with pictures of

---

all reasonable inferences in favor of the party opposing summary judgment." *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1315 (11th Cir. 2007) (quotation omitted). Here, a reasonable inference in favor of Sorrells is that Smith did not find feces and urine in the crates.

[4] In Smith's Statement of Material Facts, he stated that he viewed Sorrells's familiarity with Cedartown Feed and Seed, which sold dog food, as "an important fact[.]" Smith did not explain why he viewed Sorrells's familiarity with a dog food shop as important.

dogs";[5] "seven types of veterinary medications, some in [the] refrigerator, not issued by a veterinarian"; and "[25] photographs of dogs, some with their mouths [] duct taped shut and being force bred, labelled by name[.]"  While the 25 photographs were in "a Walmart photo envelope bearing [Sorrells's] name," Rowland's phone number was associated with the order.  Sorrells speculated that Rowland must have used her name to develop the photos.  Further, Sorrells testified in her deposition that, during this search of her home, she handed Detective Smith a book called *Dogs of Velvet and Steel*.[6]

Sometime during the search, Smith and another detective threatened to call the Department of Family and Children Services (DFACS) to take Sorrells's children from her and place them in different homes.  They said that they "would do it just to make [her] mad[.]"  As he was leaving, Detective Smith told Sorrells: "I'm giving you until Thursday at 3:00pm to give me some information

---

[5] In her deposition, Sorrells described the "three black books with pictures of dogs" as "photo book[s] from Walmart," and she "guess[ed]" that Rowland had taken the pictures.  The parties have not pointed us to any evidence describing the conditions of the dogs in the pictures.

[6] The record provides little information on this book.  Sorrells testified in her deposition that she did not know what was inside the book and that it "just had a dog on the front[.]"  She did not recall the type of dog but added that it was not "a sweet, little poodle."

In *United States v. Stevens*, the Supreme Court acknowledged that the book's author, Robert J. Stevens, "ran a business [called] 'Dogs of Velvet and Steel,' . . . through which he sold videos of pit bulls engaging in dogfights and attacking other animals."  559 U.S. 460, 466 (2010).

21-13568                Opinion of the Court                7

about [Rowland's] dog fighting.  If you don't have anything, you better make up something.    If you don't have any information . . . I'm going to 'lock you up.'"

According to Sorrells, she agreed to help Smith because she wanted the officers to leave.  But she never planned to set Rowland up and later asked one of Rowland's friends to alert him to Smith's demand.  Smith learned about Sorrells's warning to Rowland when he intercepted a call in which "somebody [told Rowland], hey, I talked to Candice.  She's suppose[d] to be trying to set you up on the phone."

On September 7, 2017, Smith applied for the first arrest warrant he sought for Sorrells on 107 felony counts of being a party to the crime[7] of cruelty to animals under O.C.G.A. § 16-12-4(b).[8] The affidavit for arrest said:

---

[7] Pursuant to O.C.G.A. § 16-2-20, anyone "concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime."  O.C.G.A. § 16-2-20(a).

[8] In relevant part, O.C.G.A. § 16-12-4(b) provides that an individual commits the crime of animal cruelty when she causes the animal "physical pain, suffering, or death," or fails to provide adequate living conditions (e.g., sufficient "food, water, sanitary conditions, or ventilation").  O.C.G.A. §§ 16-12-4(b)(1)–(2).

Although the affidavit for arrest labels the offense as a felony, we note that the code section classifies the crime of cruelty to animals as a misdemeanor. O.C.G.A. § 16-12-4(c).  Georgia law says that a person "shall be guilty of a felony" when they are "convicted of the offense of *aggravated* cruelty to animals[.]"  *Id.* § 16-12-4(e) (emphasis added).  Sorrells was not arrested for being a party to the crime of aggravated cruelty to animals.

Said offense being described as [] 16-2-20 Felony, Party To A Crime, 1 Count

Said Accused has committed the crime of party to the crime of Cruelty to Animals when said accused said she didn't have any knowledge of another defendant having that many dogs. Said Accused however had a female dog that had recently given birth to seven puppies who was extremely underweight and being forced to lay in her own feces. Said Accused also aided another defendant in committing over one hundred counts of Cruelty to Animals.

This charge is for 107 counts.[9]

Smith testified that he took out the first warrant on this date, rather than after his initial house visit or at any other point in the investigation, because Sorrells refused to help him investigate Rowland, which "led [him] to believe she [was] complicit to all the crimes[.]"

Detective Smith (alongside other officers) arrested Sorrells at Linda's during lunch on September 7 in front of her "customers, co-workers, and [] managers." According to Sorrells, Smith said, "I told you if you didn't help me I was going to lock you up." Carrie Blevins, another worker at Linda's, stated in an affidavit that Smith told her that Sorrells was arrested because she did not set Rowland up as she agreed to, and she was "arrested . . . at her job so [the

---

[9] Sorrells was charged with 107 counts because 107 dogs were found in connection with Rowland's arrest (excluding the puppies). But only the mother dog and seven puppies were found in her home.

21-13568                Opinion of the Court                9

officers] could embarrass her."  After Sorrells was arrested, Smith personally called DFACS.

On September 25, Sorrells attended a bond hearing.  During the lunch break, Smith applied for a second arrest warrant against Sorrells, this one for 107 felony counts of being a party to the crime of dogfighting.[10]  The affidavit for arrest said:

> Said offense being described as [] 16-2-20 Felony, Party To A Crime, 1 Count
>
> Said Accused is charged with Party to a Crime, 16-2-20 O.C.G.A., Said Accused is party to the crime of Dog Fighting, 16-12-37, O.C.G.A[.], (107 counts) when said accused helped and aided Mr. Devecio Rowland in fighting dogs. Ms. Sorrells had veterinary care products, and dog fighting literature at her residence . . . .

Sorrells was taken back to jail without bond, now charged with a total of 214 counts—107 for being a party to the crime of cruelty to animals (under the first affidavit for arrest) and 107 for being a party to the crime of dog fighting (under the second affidavit for arrest).

---

[10] In short, O.C.G.A. § 16-12-37(b) provides that an individual commits the felony crime of dogfighting when she engages in any number of activities related to dogfighting, including possessing, training, or selling dogs to fight, or causing dogs to fight one another.  O.C.G.A. §§ 16-12-37(b)(1)–(5).  The second affidavit for arrest does not specify which part of O.G.C.A. § 16-12-37 Sorrells violated.

In a declaration,[11] Smith said that when he sought both arrest warrants, he verbally provided the following details to the magistrate judge (in addition to what he provided in the affidavits for arrest): (1) Sorrells "was in possession of a mother dog and several puppies that had been taken" from the initial crime scene; (2) Sorrells "was in possession of several veterinary medicines, some of which were prescription-only"; and (3) Sorrells's name and telephone number were on an envelope from Walmart containing "photographs of dogs that were believed to be located in various states of neglect at the other crime scenes."

On November 6, 2017, Sorrells's case went before a grand jury. The grand jury declined to indict her and all charges against her were dismissed. Sorrells was released on November 9, having spent 63 days behind bars.

---

[11] While Smith's declaration is unsworn, it carries the same force as a sworn affidavit under 28 U.S.C. § 1746 because he signed and dated the document, and "declare[d] under penalty of perjury that" his statements "[are] true and correct." *See Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1303 n.2 (11th Cir. 2016) (clarifying that "[a]n affidavit is made under oath," while "a declaration is not sworn, but is subject to the penalty of perjury" and that under § 1746 "declarations are afforded the same legal weight as affidavits, and are treated accordingly" (alteration in original) (quotations omitted)); *Roy v. Ivy*, 53 F.4th 1338, 1348 (11th Cir. 2022) ("[U]nder § 1746, a declaration executed within the United States will substitute for a sworn affidavit if the declarant dates and subscribes the document as true under penalty of perjury in substantially the following form: 'I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature).'" (quoting 28 U.S.C. § 1746(2))).

21-13568               Opinion of the Court                    11

### B.    *Procedural History*

In 2019, Sorrells sued Smith (1) in his individual capacity under 42 U.S.C. § 1983 for malicious prosecution[12] and (2) under Georgia law for illegal arrest, false imprisonment, and IIED.[13]

Smith moved for summary judgment, arguing that (1) the malicious prosecution claim failed as a matter of law and, regardless, was barred by qualified immunity, (2) the illegal arrest and false imprisonment claims under Georgia law were barred by official immunity, and (3) the IIED claim failed as a matter of law.

The district court denied summary judgment on all three issues.  First, the court concluded that Sorrells "provided sufficient evidence to establish her malicious prosecution claim."  The court evaluated the two warrant applications and concluded that Smith should have known that they failed to establish probable cause for 106 of the 107 felony counts they each charged.  As for the single count related to the mother dog, the court concluded that "there is a question of fact as to whether [] Smith made an intentional false statement to support this charge."  The court therefore found that "the legal process justifying [Sorrells's] . . . seizure . . . was

---

[12] Sorrells originally raised a Fourth Amendment false arrest claim that the parties later agreed is properly analyzed as a malicious prosecution claim.

[13] Sorrells also raised other claims, including failure to intervene and conspiracy claims under the Fourth Amendment and conversion of personal property under Georgia law.  But Sorrells either withdrew or abandoned those claims in the district court.  We therefore do not discuss those claims in this appeal.

constitutionally infirm" and that "her seizure would not otherwise be justified without the legal process of the issued warrant." Accordingly, the court determined that Smith was not entitled to qualified immunity on the malicious prosecution claim because "Sorrells had a clearly established right to be free from a seizure based on a warrant application that a reasonably well-trained officer should have known was not supported by probable cause."

Second, addressing illegal arrest and false imprisonment together, the district court concluded that state-law official immunity did not bar either claim. Pointing to the record, "the sheer number of felonies charged, and the timing of the second warrant," the district court found that Sorrells "presented sufficient evidence to create a question of fact as to whether Detective Smith acted with malice or a deliberate intent to cause her injury." Accordingly, the court denied summary judgment with respect to the illegal arrest and false imprisonment claims.

Finally, addressing IIED, the court concluded that Sorrells "presented sufficient evidence in support of her IIED claim to proceed before a jury" and denied summary judgment with respect to that claim.

This appeal followed.

## II. Standard of Review

"Although we ordinarily have no jurisdiction to review the denial of a motion for summary judgment, we can review denials of qualified immunity and state-agent immunity under the

collateral-order doctrine." *Aguirre*, 965 F.3d at 1156. We review the denial of qualified and official immunity *de novo*, "viewing the facts in the light most favorable to the nonmovant." *Id.* (quotations omitted). "Summary judgment is warranted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)).

We review our jurisdiction *de novo*. *McKusick v. City of Melbourne*, 96 F.3d 478, 482 (11th Cir. 1996).

### III.    Discussion

Smith presents three issues on appeal: (1) whether the malicious prosecution claim under § 1983 is barred by qualified immunity, (2) whether the illegal arrest and false imprisonment claims under Georgia law are barred by official immunity, and (3) whether the IIED claim fails as a matter of law. We take each issue in turn.

(1)    *Whether the malicious prosecution claim is barred by qualified immunity*

Smith argues on appeal that he is entitled to qualified immunity because he did not violate Sorrells's Fourth Amendment right to be free from unreasonable seizure as a result of a malicious prosecution. *See Chiaverini v. City of Napoleon*, 144 S. Ct. 1745 (2024) (discussing the contours of "what is often called a Fourth Amendment malicious-prosecution claim under 42 U.S.C. § 1983"). According to Smith, he did not violate the Fourth Amendment because the information known to him at the time of the two

affidavits for arrest against Sorrells amounted to actual probable cause, if not arguable probable cause.

Qualified immunity protects government officials from being sued in their individual capacities when they are performing discretionary functions. *Aguirre*, 965 F.3d at 1156. "To determine whether qualified immunity applies, we engage in a burden-shifting analysis." *Brooks v. Miller*, 78 F.4th 1267, 1280 (11th Cir. 2023). The first step requires a defendant to show that "he acted within his discretionary authority." *Aguirre*, 965 F.3d at 1156 (quotations omitted). Once the defendant makes that showing, the burden shifts to the plaintiff to prove that qualified immunity does not apply. *Id.* To show that qualified immunity does not apply, "a plaintiff must . . . prove that the defendant violated a constitutional right that was clearly established when the violation allegedly occurred." *Id.* (quotations omitted). "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Id.* (quotations omitted).

The parties do not dispute that Smith acted within his discretionary authority. And Smith has waived any issue concerning whether he violated "clearly established" law at the time of the alleged violation because he failed to raise it in his opening brief on appeal.[14] *Sapuppo v. Allstate Floridian Ins. Co.*, 739

---

[14] Smith's reply brief discusses whether the any-crime rule was "clearly established" at the time of the facts of his case, an issue we will address in our discussion of probable cause in the malicious prosecution context. But any

F.3d 678, 682–83 (11th Cir. 2014).  The parties therefore focus—and so do we—on whether Smith violated Sorrells's Fourth Amendment right to be free from unreasonable seizure as a result of a malicious prosecution.

We first briefly discuss the details of the underlying prosecution—the 214 counts Smith charged against Sorrells, which formed the basis for her seizure—before discussing whether it amounted to a malicious prosecution.

A.    *The underlying prosecution*

Smith charged Sorrells with 214 counts under Georgia law in the two affidavits for arrest: (1) 107 counts of being party to the felony crime of cruelty to animals under the first affidavit for arrest; and (2) 107 counts of being party to the felony crime of dogfighting under the second affidavit for arrest.  The two affidavits for arrest invoke Georgia's party to a crime statute, which says that anyone "concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime." O.C.G.A. § 16-2-20(a).  "Georgia's party-to-a-crime statute is a catch-all statute that indicates a person can be convicted as a principal to a crime whether [she] directly committed the crime, aided and abetted its commission, or caused it to be committed." *United States v. Roosevelt Coats*, 8 F.4th 1228, 1250 (11th Cir. 2021). Specifically, the Georgia Code provides that an individual "is

other arguments concerning whether Smith violated "clearly established" law are neither raised by Smith nor addressed in this opinion.

concerned in the commission of a crime only if [she]" does one of the following: (1) "[d]irectly commits the crime"; (2) intentionally causes another to commit the crime "under such circumstances that the other person is not guilty of any crime either in fact or because of legal incapacity"; (3) aids or abets in the crime; or (4) "[i]ntentionally advises, encourages, hires, counsels, or procures another to commit the crime."  O.C.G.A. § 16-2-20(b).  Smith's affidavits did not reference whether Sorrells was seized as a principal (the person who directly committed the crime) or as an aider and abettor of the crime, so "we must assume that [Sorrells] was . . . an aider and abettor," *Roosevelt Coats*, 8 F.4th at 1243, which "encompasses the concept of helping in the commission of a crime," *Sharpe v. State*, 531 S.E.2d 84, 89 (Ga. 2000).

Pursuant to O.C.G.A. § 16-2-21, "[a]ny party to a crime who did not directly commit the crime may be indicted, tried, convicted, and punished for commission of the crime upon proof that the crime was committed and that [she] was a party thereto[.]" *Id.* § 16-2-21; *see also Brinson v. State*, 413 S.E.2d 443, 444 (Ga. 1992) (stating O.C.G.A. § 16-2-21 "provides that one who is a party to the crime may be indicted, convicted and punished for that crime upon proof that [she] was a party to the crime"). Because Rowland was convicted for the crimes of animal cruelty and dogfighting, we assume that there is "proof that the crime[s] [were] committed" and focus our analysis on whether Sorrells was a party to those crimes. *See* O.C.G.A. § 16-2-21.

21-13568                Opinion of the Court                17

The Supreme Court of Georgia has explained that to establish that one was a party to a crime, "[t]here must be some evidence showing that the defendant shared a common criminal intent to commit the crimes in question with the actual perpetrators." *Higuera-Guiterrez v. State*, 779 S.E.2d 288, 290 (Ga. 2015). "Criminal intent may be inferred from [a person's] *conduct* before, during, and after the crime." *Id.* (emphasis added). And we have stated that O.C.G.A. § 16-2-20 requires that "a defendant *affirmatively act* in furtherance of a crime to be convicted as a party to the crime[.]" *Roosevelt Coats*, 8 F.4th at 1250 (emphasis added).

B.      *Sorrells's malicious prosecution claim*

Based on the 214 counts against her, Sorrells was arrested and held in jail. She asserts a § 1983 claim, arguing that Smith violated "[her] clearly established right under the Fourth Amendment to be free from an unreasonable seizure as a result of a malicious prosecution." *Aguirre*, 965 F.3d at 1157.

"We can simplify our standard for malicious prosecution into two elements: the plaintiff must prove (1) that the defendant violated [her] Fourth Amendment right to be free from seizures pursuant to legal process and (2) that the criminal proceedings against [her] terminated in [her] favor."[15] *Luke v. Gulley*, 975 F.3d 1140, 1144 (11th Cir. 2020). Sorrells can easily prove the second

---

[15] This malicious prosecution claim differs from a false arrest or imprisonment claim, which involves a seizure that takes place without legal process, such as through a warrantless arrest. *Aguirre*, 965 F.3d at 1157–58.

element because a grand jury declined to indict her and all charges against her were dismissed.  So we focus our analysis on the first element.

Under the first element, to establish that Smith violated her Fourth Amendment right to be free from seizures pursuant to legal process, Sorrells "must establish (1) that the legal process justifying [her] seizure was constitutionally infirm and (2) that [her] seizure would not otherwise be justified without legal process." *Aguirre*, 965 F.3d at 1165.  Because Smith does not contest the district court's finding that Sorrells's seizure would not otherwise be justified, we solely evaluate whether her seizure was constitutionally infirm.

In this inquiry, we ask "whether 'the *judicial officer* issuing such a warrant [was] supplied with sufficient information to support an independent judgment that probable cause exist[ed] for the warrant.'"[16] *Id.* at 1162 (emphasis added) (alteration in original) (quoting *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 564 (1971)).  Sorrells can prove that her seizure was constitutionally infirm if she makes one of two showings.  First, Sorrells can show that Smith "intentionally or recklessly made misstatements or omissions necessary to support the warrant."  *Id.*  If Sorrells has "presented a genuine dispute of fact about whether [her] seizure was unconstitutional," "we assume that the statement was false and consider (1) whether it was made either intentionally or in

---

[16] This warrant-based seizure inquiry differs from our inquiry into warrantless arrests, which "concern[s] whether the facts known to the arresting *officer* establish probable cause[.]" *Aguirre*, 965 F.3d at 1162–63 (emphasis added).

21-13568               Opinion of the Court                    19

reckless disregard for the truth and, if so, (2) whether, after deleting the misstatement[,] the affidavit is insufficient to establish probable cause." *Id.* (quotations omitted).

Second, Sorrells can show that Smith "should have known that his [warrant] application failed to establish probable cause[.]" *Id.* Probable cause "depends on the totality of the circumstances[.]" *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (quotations omitted). It "is not a high bar"; "[i]t requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id.* (quotations omitted). But "conclusory [statements] clearly [are] insufficient to establish probable cause." *Kelly v. Curtis*, 21 F.3d 1544, 1555 (11th Cir. 1994) (quoting *Garmon v. Lumpkin Cnty.*, 878 F.2d 1406, 1408–09 (11th Cir. 1989)).

As an initial matter, we must determine whether Smith needed probable cause for all of the specific crimes listed in the affidavit, or if Smith only needed probable cause for "any crime." Under the "any-crime" rule, officers are insulated "so long as probable cause existed to arrest the suspect for *some* crime, even if it was not the crime the officer thought or said had occurred." *Aguirre*, 965 F.3d at 1158. At the time of Smith's conduct in 2017, the law was unsettled as to whether the any-crime rule applied to claims of malicious prosecution. *See id.* at 1159 (discussing unsettled state of the law before 2020). We had assumed, without deciding, in several cases that the any-crime rule applied to Fourth Amendment malicious prosecution claims. *See Paez v. Mulvey*, 915

F.3d 1276, 1285–86 (11th Cir. 2019).  Only after Sorrells's arrest did we (and later the Supreme Court) hold that the "any-crime" rule does not apply to malicious prosecution claims—meaning that officers need to show probable cause for each of the exact crimes the officer said occurred in order to pass muster under the Fourth Amendment.  *Chiaverini*, 144 S. Ct. at 1750–51 (the U.S. Supreme Court's holding that the "any-crime" rule does not apply to claims of malicious prosecution); *Aguirre*, 965 F.3d at 1162 (this Court's holding that "the any-crime rule does not apply to claims of malicious prosecution").  Because the qualified immunity analysis focuses on whether the law was clearly established at the time of the officer's actions, *Aguirre*, 965 F.3d at 1156, and, as of 2017, the law on the application of the any-crime rule was at best unsettled, we accept (for purposes of this opinion only) that the any-crime rule applied to the claim of malicious prosecution brought in 2017 against Smith.  *See Paez*, 915 F.3d at 1285–86 (stating our Court's prior assumption that the any-crime rule applied to malicious prosecution claims).  Under this assumption, to prevail, Sorrells must show that probable cause does not support even a single count that Smith raised against her.

> i.    Whether the first affidavit for arrest was constitutionally infirm

The first affidavit for Sorrells's arrest was for 107 counts of being a party to the felony crime of cruelty to animals:

> Said offense being described as [] 16-2-20 Felony, Party To A Crime, 1 Count

Said Accused has committed the crime of party to the crime of Cruelty to Animals when said accused said she didn't have any knowledge of another defendant having that many dogs. Said Accused however had a female dog that had recently given birth to seven puppies who was extremely underweight and being forced to lay in her own feces. Said Accused also aided another defendant in committing over one hundred counts of Cruelty to Animals.

This charge is for 107 counts.

We analyze the warrant line by line to evaluate whether Smith "intentionally or recklessly made misstatements or omissions necessary to support the warrant," or whether Smith should have known that the information presented to the magistrate judge failed to establish probable cause. *Aguirre*, 965 F.3d at 1165.

The first sentence simply states that Sorrells denied having knowledge of Rowland owning a lot of dogs. It does not establish anything remotely resembling probable cause. For example, no other evidence is presented that could tie Sorrells to Rowland's crimes. "[S]uch . . . conclusory [statements] clearly [are] insufficient to establish probable cause." *Kelly*, 21 F.3d at 1555 (quotations omitted); *Garmon*, 878 F.2d at 1408 (statement that "to the best of [affiant's] knowledge and belief [plaintiff] did . . . commit the offense of false report of a crime" was "clearly . . . insufficient to establish probable cause").

The second sentence states that Sorrells "had a female dog that had recently given birth to seven puppies who was extremely underweight and being forced to lay in her own feces." On its face, this sentence might appear to present probable cause to arrest Sorrells for being a party to animal cruelty. But there is a genuine dispute of material fact as to whether that sentence—which relates to just one of the first affidavit for arrest's 107 counts against her—is false. *See Aguirre*, 965 F.3d at 1167. Viewing the evidence in the light most favorable to Sorrells as the nonmovant, there is evidence in the record that the mother dog and puppies were not being abused and lived in clean, spacious conditions—and that Smith had observed as much when he visited Sorrells's home on August 31. From this evidence, a reasonable jury may conclude that Smith's assertion in his September 7 affidavit for arrest about the female dog—that she "was extremely underweight and [was] forced to lay in her own feces"—was false. Smith's contention merely presents "a genuine dispute of material fact" about whether the dog was underweight in Sorrells's care, and ultimately, "about whether the warrant was invalid" due to an "intentional[] or reckless[] . . . misstatement," precluding summary judgment. *Id.* at 1165, 1167.

Because Sorrells has "presented a genuine dispute of fact" regarding the mother dog, implicating "whether [her] seizure was unconstitutional," "we assume that the statement was false and consider [] whether it was made either intentionally or in reckless disregard for the truth[.]" *Id.* at 1165 (alterations adopted) (quotations omitted).

21-13568                 Opinion of the Court                 23

It is not difficult to conclude that it was. A jury could infer that Smith's assumed false statements about the mother dog in the second sentence were made intentionally or in reckless disregard for the truth as retaliation for Sorrells's refusal to help Smith investigate Rowland. This conclusion is particularly easy to reach given Smith's threat to arrest Sorrells if she did not provide information on Rowland's crimes, the timing of Sorrells's arrest after she alerted Rowland to Smith's instructions to provide "some information about [Rowland's] dog fighting," and Blevins's affidavit corroborating that Smith arrested Sorrells for not setting up Rowland. Additionally, Smith's own deposition reveals that he applied for the arrest warrant because Sorrells would not help him find incriminating information on Rowland. From this evidence, a reasonable jury could infer that Smith made the assumed false statement about the mother dog in the first affidavit for arrest "intentionally or in reckless disregard for the truth," and therefore the second sentence is constitutionally infirm. *Id.*

We turn to the third and final sentence, which merely says that Sorrells "aided another defendant in committing over one hundred counts of Cruelty to Animals." This conclusory sentence does not salvage the warrant. It fails to mention any dogs or connect Sorrells to any dogs. Again, "such . . . conclusory [statements] clearly [are] insufficient to establish probable cause." *Kelly*, 21 F.3d at 1555 (quotations omitted); *Garmon*, 878 F.2d at 1408.

So, viewing all three sentences together, and deleting the statement about the mother dog, a genuine dispute of fact exists as to whether Smith "should have known that his application failed to establish probable cause" for all of the 107 counts against Sorrells in the first affidavit for arrest. *Aguirre*, 965 F.3d at 1165.

Smith urges us also to consider three pieces of information that he allegedly verbally provided the magistrate judge when applying for the first arrest warrant:[17] (1) that Sorrells "was in possession of a mother dog and several puppies that had been taken" from the initial crime scene; (2) that Sorrells "was in possession of several veterinary medicines, some of which were prescription-only"; and (3) that Sorrells's name and telephone number were on an envelope from Walmart containing "photographs of dogs that were believed to be located in various states of neglect at other crime scenes."

---

[17] Our case law broadly states that "judicial review of the sufficiency of an affidavit for the issuance of a warrant must be strictly confined to the information brought to the magistrate's attention." *W. Point-Pepperell, Inc. v. Donovan*, 689 F.2d 950, 959 (11th Cir. 1982). However, many of our cases evaluate the facts and circumstances brought to the magistrate's attention in a *warrant affidavit*. *See, e.g.*, *Luke*, 50 F.4th at 96. We need not decide whether it is appropriate to evaluate information verbally imparted outside of the written affidavits because the parties do not dispute that we should consider this category of information and because it does not change the result. So, for purposes of this opinion, we consider the information that Smith attests that he verbally provided to the magistrate judge when he sought both arrest warrants.

These three oral statements fail to establish probable cause because they lack any showing of intent or affirmative action on behalf of Sorrells to suggest that she was a party to Rowland's crimes under Georgia precedent. *See Higuera-Guiterrez*, 779 S.E.2d at 290; *Roosevelt Coats*, 8 F.4th at 1250. Furthermore, viewing the evidence in the light most favorable to Sorrells, the veterinary care products and Walmart envelope could have easily belonged to Rowland, who sometimes stayed in her home. Sorrells testified that the phone number on the Walmart envelope belonged to Rowland, so Rowland could have used her name to develop the photos, as Sorrells claimed, and left them at her house. Smith even admits on appeal that "[Sorrells's] mere possession of the photographs [did] not mean that she and Rowland share[d] criminal intent[.]" Furthermore, veterinary care products would seem to help rather than harm the animals in Sorrells's care. Accordingly, this information does not show "a substantial chance of criminal activity" on Sorrells's part, and therefore falls short of meeting the probable cause requirement. *Wesby*, 583 U.S. at 57 (quotations omitted).

Because of the foregoing, we conclude that the first affidavit for arrest, even when supplemented by the three facts verbally provided by Smith to the magistrate judge, failed to establish probable cause for any of the 107 counts against Sorrells and therefore was "constitutionally infirm." *Aguirre*, 965 F.3d at 1165.

ii.    Whether the second affidavit for arrest was constitutionally infirm

Next, we turn to the second affidavit for arrest, which Smith presented to the magistrate judge over a lunch break during Sorrells's bond hearing for 107 counts of being a party to the felony crime of dogfighting:

> Said offense being described as [] 16-2-20 Felony, Party To A Crime, 1 Count

> Said Accused is charged with Party to a Crime, 16-2-20 O.C.G.A., Said Accused is party to the crime of Dog Fighting, 16-12-37, O.C.G.A[.], (107 counts) when said accused helped and aided Mr. Devecio Rowland in fighting dogs. Ms. Sorrells had veterinary care products, and dog fighting literature at her residence . . . .

We again start with the first sentence, which states that Sorrells "helped and aided Mr. Devecio Rowland in fighting dogs." Smith should have known that this sentence failed to establish probable cause because it lacks facts and is therefore conclusory. *See Kelly*, 21 F.3d at 1555; *Garmon*, 878 F.2d at 1408.

The second sentence, which says that "Sorrells had veterinary care products[] and dog fighting literature"[18] at her

---

[18] Smith's reference to "dogfighting literature" likely refers to the book titled *Dogs of Velvet and Steel* that Sorrells handed to Detective Smith during a search of her house. While we do not opine on whether or not the book was in fact dogfighting literature, we accept for purposes of this opinion that Smith labeled it as such in his affidavit for the second arrest warrant.

home, is also insufficient to support probable cause for any count for being a party to the crime of dogfighting, let alone 107 counts. Smith should have known that, pursuant to Georgia law, the information that Sorrells possessed veterinary medication and dog fighting literature is not enough to show probable cause that Sorrells was party to a crime. This sentence does not demonstrate Sorrells's "intent to commit the crimes in question" with Rowland, *Higuera-Guiterrez*, 779 S.E.2d at 290, or affirmative action "in furtherance of a crime," *Roosevelt Coats*, 8 F.4th at 1249–50. The sentence therefore falls short of showing "a substantial chance of criminal activity," or probable cause that Sorrells was party to Rowland's crimes. *Wesby*, 583 U.S. at 57 (quotations omitted).

Just as he did for the first affidavit for arrest, Smith verbally provided the same three additional details to the magistrate judge alongside his second affidavit for arrest: (1) that Sorrells "was in possession of a mother dog and several puppies that had been taken" from the initial crime scene; (2) that Sorrells "was in possession of several veterinary medicines, some of which were prescription-only"; and (3) that Sorrells's name and telephone number were on an envelope from Walmart containing "photographs of dogs that were believed to be located in various states of neglect at other crime scenes." These three details fail to satisfy probable cause for the same reasons already stated in our discussion under the first affidavit for arrest.

Accordingly, the second affidavit for arrest was constitutionally infirm because Smith "should have known that his

application failed to establish probable cause" for each of the 107 counts against Sorrells.  *Aguirre*, 965 F.3d at 1165.

### C.    *Smith's counterarguments*

Smith resists our reliance on *Aguirre* to conclude his two affidavits for arrest were constitutionally infirm, and in doing so he advances two points.  First, he contends that cases before *Aguirre* looked to the officer's *knowledge*, rather than the information the officer actually *presented* to the magistrate judge, to determine whether probable cause existed.  Smith argues that, because he applied for the two arrest warrants before *Aguirre* was decided, we should evaluate the malicious prosecution claim through the lens of Smith's knowledge.  His approach, he argues, would lead us to conclude that the information known to him at the time of the affidavits for arrest amounts to probable cause.

Even assuming that Smith possessed information that would lead us to such a conclusion on probable cause, our analysis does not turn on the information known to him.  As Smith himself acknowledges, *Aguirre* "sought to *harmonize* prior malicious prosecution precedents within the Eleventh Circuit" (emphasis added).  It did not create a new rule.  Although some of our previous decisions do say that probable cause for malicious prosecution "turns on the facts and circumstances within the [arresting] officer's knowledge," our earliest cases "look only to the information before the judicial officer that issued the legal process for the seizure."  *Id.* at 1158 (quotations omitted); *see id.* at 1163 (explaining the same).  As we explained in *Aguirre*, the prior panel

precedent rule dictates that we "follow the earliest precedent that reached a binding decision on the issue." *Id.* at 1163. And our "earliest decisions asked whether the *judicial* officer who made the probable-cause determination" was presented with "sufficient, truthful information to establish probable cause." *Id.* (emphasis added). So "an otherwise insufficient affidavit cannot be rehabilitated with information possessed by the officer when he sought the warrant but not disclosed to the issuing magistrate." *Id.* at 1162 (alterations adopted) (quoting *Whiteley*, 401 U.S. at 565 n.8). Smith's argument falls short, and *Aguirre* controls.[19]

Smith also resists our conclusion that both affidavits for arrest were constitutionally infirm by arguing that we should give "great deference" to the magistrate judge's finding on probable cause. But "[d]eference to the magistrate [judge] . . . is not boundless." *United States v. Leon*, 468 U.S. 897, 914 (1984). For example, such deference "does not preclude inquiry into the

---

[19] Smith also argues that he at least had arguable probable cause, a lesser standard than actual probable cause, which exists when "a reasonable officer presented with the corrected version of [the] affidavit could reasonably but mistakenly conclude that probable cause is present to suspect [the plaintiff]." *Sylvester v. Fulton Cnty. Jail*, 94 F.4th 1324, 1331 (11th Cir. 2024) (quotations omitted). But even if we considered information known to Smith (but not presented to the magistrate judge)—for example, information tied to Rowland's crimes and Sorrells's relationship with Rowland—that information would not lead an officer to "reasonably but mistakenly conclude that probable cause is present[.]" *Id.* The information he points to does not save the deficiencies in both affidavits for arrest addressed above, as it would still lead to a seizure in violation of the Fourth Amendment. *See id.* at 1332.

knowing or reckless falsity of the affidavit on which that determination was based." *Id.*; *see also Aguirre*, 965 F.3d at 1158 ("A Fourth Amendment violation . . . occurs 'when legal process itself goes wrong—when, for example, a judge's probable-cause determination is predicated solely on a police officer's false statements.'" (quoting *Manuel v. City of Joliet*, 580 U.S. 357, 367 (2017))).  And reviewing courts will not defer to a magistrate judge's "mere ratification of the bare conclusions of others." *Leon*, 468 U.S. at 915 (quoting *Illinois v. Gates*, 462 U.S. 213, 239 (1983)). Because Smith based his two affidavits for arrest on misstatements or omissions made intentionally or recklessly, and because Smith's bare conclusions were not sufficient to support the magistrate judge's determinations of probable cause, no deference is warranted to the magistrate judge's finding on probable cause.

****

We hold that "[Sorrells] has met [her] burden to establish a genuine dispute of fact about whether [s]he was seized in violation of the Fourth Amendment." *Aguirre*, 965 F.3d at 1167.  We therefore affirm the denial of summary judgment on the issue of qualified immunity.

(2)    *Whether the illegal arrest and false imprisonment claims under Georgia law are barred by official immunity*

Smith also argues that the district court improperly denied his motion for summary judgment on the state-law claims based on official immunity.  He summarily argues that official immunity

bars the illegal arrest and false imprisonment claims against him[20] "[b]ecause [Sorrells] lacks evidence to support actual malice[.]"

Official immunity is Georgia's "analogue to qualified immunity." *Smith v. LePage*, 834 F.3d 1285, 1297 (11th Cir. 2016). Evaluating official immunity requires "inquir[ing] into [Smith's] subjective intent[.]" *Jordan v. Mosley*, 487 F.3d 1350, 1357 (11th Cir. 2007) (applying Georgia law). State officers and employees "may be liable for injuries and damages if they act [1] with actual malice or [2] with actual intent to cause injury in the performance of their official functions." Ga. Const., art. I, § 2, ¶ IX(d) (1983); *see also Patel v. Lanier Cnty. Ga.*, 969 F.3d 1173, 1191 (11th Cir. 2020) ("Under Georgia law, a public officer or employee may be personally liable . . . for . . . acts performed with malice or an intent to injure." (quoting *Grammens v. Dollar*, 697 S.E.2d 775, 777 (Ga. 2010))).

The Supreme Court of Georgia has held that "'actual malice' requires a deliberate intention to do wrong." *Adams v. Hazelwood*, 520 S.E.2d 896, 898 (Ga. 1999) (quoting *Merrow v. Hawkins*, 467 S.E.2d 336, 337 (Ga. 1996)). "A 'deliberate intention to do wrong' . . . must be the intent to cause the harm suffered by

---

[20] On appeal, Smith actually argues that official immunity bars "all state law claims" against him. But Smith only argued below that official immunity bars his illegal arrest and false imprisonment claims. So any argument regarding his IIED claim as it pertains to official immunity is raised for the first time on appeal, and we do not address it. *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1335 (11th Cir. 2004) (stating that "[w]e will not address a claim . . . that is being raised for the first time on appeal, without any special conditions" present).

the plaintiffs." *Murphy v. Bajjani*, 647 S.E.2d 54, 59 (Ga. 2007). "Proof of ill will alone is not enough." *Hardigree v. Lofton*, 992 F.3d 1216, 1233 (11th Cir. 2021).

The district court properly denied summary judgment on the issue of official immunity because Sorrells presented sufficient evidence to create a question of fact as to whether Smith acted with actual malice—*i.e.*, a deliberate intention to arrest Sorrells for a crime she did not commit. *Adams*, 520 S.E.2d at 898. The record, viewed in the light most favorable to Sorrells, shows that Smith told Sorrells that he would "lock [her] up"—and ultimately did so—for not helping him investigate Rowland, rather than for being involved in Rowland's crimes of cruelty to animals and dogfighting. In fact, Smith testified that he took the warrant out only after he understood that Sorrells refused to help him investigate Rowland. From this evidence, and given the lack of probable cause, a reasonable jury could find that Smith applied for the arrest warrants with the deliberate "intent to do a wrongful act—to imprison [Sorrells] unlawfully" in retaliation for her refusal to help him investigate Rowland. *Jordan*, 487 F.3d at 1357 (denying summary judgment on official immunity where plaintiff presented evidence that defendant pursued an arrest warrant to "collect a civil debt" to "teach [the plaintiff] a lesson"); *see also Hardigree*, 992 F.3d at 1233 (stating that the "jury could find malice" where plaintiff asserted enough facts to support that an officer tased him and arrested him on charges that "had no basis"); *Lagroon v. Lawson*, 759 S.E.2d 878, 883 (Ga. Ct. App. 2014) ("[A] jury reasonably could infer that [officers] arrested [plaintiffs] and took steps to secure grand

jury charges against them despite knowing that they had not committed any offenses, thereby establishing that the officers deliberately intended to do a wrongful act." (alterations adopted) (quotations omitted)).[21]

Because of the foregoing, we affirm the district court's denial of summary judgment on the issue of official immunity for the state-law claims of illegal arrest and false imprisonment.

(3)      *Whether the IIED claim fails as a matter of law*

Smith argues on appeal that Sorrells's IIED claim fails as a matter of law and that the district court erred in denying him summary judgment with respect to that claim. The IIED claim, however, presents a jurisdictional problem in this Court and, accordingly, we dismiss the issue raised on appeal.

---

[21] Although we end our official immunity analysis here, we also note that a reasonable jury could find that Smith applied for the arrest warrants "with actual intent to cause injury in the performance of [his] official functions." Ga. Const., art. I, § 2, ¶ IX(d). "The phrase actual intent to cause injury . . . mean[s] an actual intent to cause harm to the plaintiff, not merely an intent to do the act purportedly resulting in the claimed injury." *Kidd v. Coates*, 518 S.E.2d 124, 125 (Ga. 1999) (quotations omitted).

Sorrells presented sufficient evidence to create a question of fact as to whether Smith acted with an actual intent to harm her by putting her in jail and removing her from her children. *See id*. For example, according to Sorrells, Smith threatened to call DFACS "just to make [her] mad[.]" And after Sorrells was arrested, Smith personally called DFACS. Further, Blevins stated that Smith told her that he arrested Sorrells at work to "embarrass her." So, for this additional reason, the district court properly denied summary judgment on the issue of official immunity.

"We have a threshold obligation to ensure that we have [appellate] jurisdiction," even where no party has raised the issue. *Corley v. Long-Lewis, Inc.*, 965 F.3d 1222, 1227 (11th Cir. 2020). "Under the pendent appellate jurisdiction doctrine, we may address otherwise nonappealable orders if they are inextricably intertwined with an appealable decision or if review of the former decision is necessary to ensure meaningful review of the latter." *Hudson v. Hall*, 231 F.3d 1289, 1294 (11th Cir. 2000) (alterations adopted) (quotations omitted). Further, "the exercise of pendent appellate jurisdiction is discretionary, and we have not been shy about declining to indulge in it." *Jackson v. City of Atlanta*, 97 F.4th 1343, 1354 (11th Cir. 2024); *see also King v. Cessna Aircraft Co.*, 562 F.3d 1374, 1379 (11th Cir. 2009) ("[T]he Supreme Court has signaled that pendent appellate jurisdiction should be present only under rare circumstances.").

Because we may resolve the issues of qualified immunity and official immunity without reaching the merits of the IIED claim, the IIED issue is not "sufficiently interwoven . . . to fall within [our] pendent appellate jurisdiction." *Harris v. Bd. of Educ. of Atlanta*, 105 F.3d 591, 595 (11th Cir. 1997); *see Valderrama v. Rousseau*, 780 F.3d 1108, 1111 n.3 (11th Cir. 2015) ("Because we may resolve the qualified immunity issue without reaching the merits of the state law claims . . . , we lack jurisdiction to reach those claims." (quotations omitted)). And the issue of IIED, on the one hand, and the issues of qualified and official immunity, on the other, are not essential to each other. *Hudson*, 231 F.3d at 1294. We therefore lack jurisdiction to reach the IIED claim and dismiss

this issue.  As a result, the IIED claim remains pending in the district court.

## IV.    Conclusion

For the above reasons, we (1) affirm the denial of summary judgment on the issue of qualified immunity for the malicious prosecution claim, (2) affirm the denial of summary judgment on the issue of official immunity for the state-law claims of illegal arrest and false imprisonment, and (3) dismiss the IIED issue for lack of appellate jurisdiction.

**AFFIRMED IN PART, DISMISSED IN PART.**